IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **COSANDRA CARR,** | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | Civil Case Number: RWT 07-2554 |
|  | * | |
| **PRINCE GEORGE'S COUNTY, MARYLAND,** | * | |
| Defendant | * | |

## MEMORANDUM OPINION

### I.  BACKGROUND

Plaintiff Cosandra Carr was hired by Defendant Prince George's County Police Department ("Department") in 1990, has been a sworn police officer since 1993, and then held the rank of Corporal, a position which she currently holds. She has received satisfactory performance evaluations.

Carr has not performed routine police patrol work since 2004. In April 2005, Carr told Donald Bell, a friend and fellow Corporal with the Department, that she had been the victim of a rape. Bell assumed that the assailant was a member of the Department, but Carr refused to disclose the identity of her assailant. Bell spoke with Lt. Col. Jeff Cox about Carr's alleged rape and assisted with Carr's transfer to the Telephone Reporting Unit ("TRU"). Officers in the TRU write up police reports based upon telephone calls from citizens about matters that do not require a response by an on-duty patrol officer. This transfer was intended to be temporary to permit Carr to manage her various personal difficulties, including her alleged rape and her care arrangements for her special needs child. Carr worked there from May 2005 to September of 2007, and was on full-duty, light-duty, and no-duty status during this time.

1

On February 9, 2006, while Carr was employed in the TRU, she was notified that she was being transferred from the TRU back to full-duty patrol work at District V effective February 19, 2006, because the Department wanted all able-bodied officers to return to patrol to combat the rising crime rate. Carr told Corporal Bell that she had childcare issues, she needed to have surgery due to her rape, and she was concerned about being transferred back to full-duty patrol work. Carr also told Bell that she believed that she was being transferred because she would not accept a position with Lieutenant Shawne Waddy at the Criminal Investigations Division Sexual Assault Unit. Bell told Captain Berault about Carr's concerns.

While Bell was on leave, the Department launched an investigation into Carr's allegation of sexual assault. Sgt. Disque along with Major Christine Peel conducted the investigation, in which they interviewed witnesses, including Carr. Based upon statements that Carr made to Peel regarding her concern that she might hurt herself or others if placed back on patrol status, Peel instituted a discretionary suspension of Carr's police powers on February 14, 2006. The next day, a suspension hearing was held, at which Carr was present and represented by counsel and in which it was determined that Carr would remain suspended.

During the course of Carr's suspension, Hylton placed Carr back in TRU under the supervision of Sgt. Jacqueline Jackson.

On February 19, 2006 (which was the date that that Carr was supposed to be transferred to patrol before her suspension took place), Corporal Carlton Jones, who was involved in a highly-publicized shooting, was notified that he was being transferred from patrol to the TRU. Jones worked in TRU for approximately one month, during which time Carr was also working there. He ultimately requested a transfer out of the TRU, which was granted, because he did not like the way

2

Carr was treating him. Carr remained at the TRU after Jones was transferred to District 5, Clinton Station.

As a result of the suspension hearing, Carr was ordered on March 24, 2006, to undergo a psychiatric evaluation with Dr. Bruce Smoller. At the April 17, 2006, evaluation, Dr. Smoller concluded that Carr was not suffering from any type of psychological disorder, but rather that her childcare issues were her primary concern. Dr. Smoller's report was submitted for review by the Medical Advisory Board ("MAB"), which is a group of designated physicians appointed by the County Executive to assist agencies in fitness-for-duty determinations. The MAB found that Carr was fit for full-duty status and by letter dated May 9, 2006, Police Chief Melvin High ordered Carr back to full-duty status. On May 11, 2006, Disque ordered Carr to report to the firearms range for recertification because she had not completed the night-fire course during 2006 – and thus was not qualified for duty.

Carr did not file an internal charge of discrimination with the Police Department. She filed her formal charge of discrimination on June 1, 2006, which alleged gender discrimination and retaliation. Notice of the filing of the Charge of the Discrimination was provided to the Defendant on November 9, 2006, but because it was addressed to the incorrect person, the Department was first made aware of the charge when suit was filed in this Court on September 25, 2007.

Carr was transferred from the TRU to the Automotive Services Unit ("ASU") in September 2007. In the ASU, Carr is responsible for transporting vehicles to get them properly outfitted for equipment, putting tags on vehicles, and issuing vehicles to other officers.

3

Defendant has moved for summary judgment.[1]

## II. ANALYSIS

### A.   Standard of Review

Summary judgment is proper if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A dispute of material fact is genuine if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248-49. The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986).

---

[1] Defendant has moved to strike Plaintiff's Exhibit 10, which is appended to Plaintiff's Opposition to its Motion for Summary Judgment. This is a declaration executed by Plaintiff *after* her deposition was taken. Defendant contends that the exhibit should be stricken because Plaintiff executed and filed it for the sole purpose of attempting to create a material fact by contradicting her earlier deposition testimony.

The Court grants in part and denies in part the motion to strike. The Court grants the motion in part as it pertains to Carr's later-executed declaration because a review of this declaration as compared to Carr's earlier contradictory deposition testimony suggests Carr is attempting to use it to create a genuine issue of fact as it contradicts her earlier deposition testimony in which she did not allege that Peel promised that things would get better for Carr if she dropped her discrimination claim – this is impermissible. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

The remainder of the motion to strike concerns misstatements of the facts in the record that Defendant alleges that Plaintiff has made or concerns Plaintiff's allegations that are without factual support in the record. Those allegations are addressed in greater detail by this memorandum opinion and thus this portion of the motion to strike is denied in part.

The Court may rely upon only those facts that are supported by the record – not simply assertions in the pleadings – in order to fulfill its affirmative obligation to prevent factually unsupported claims or defenses from proceeding to trial. *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323-24). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmovants, and all justifiable inferences are to be drawn in their favor. *Anderson*, 477 U.S. at 255.

**B.    The Merits**

    **1.    Discrimination**

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race . . . ." 42 U.S.C. § 2000e-2(a)(1).

To defeat summary judgment, a plaintiff must present either direct or circumstantial evidence of discrimination. Here, Plaintiff does not present any direct evidence of discrimination so her claim must be evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, a plaintiff must state a prima facie case of discrimination, which requires proof that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004) (en banc). Once a plaintiff has presented a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 284. This burden is not one of persuasion, but

rather one of production. *Id.* Once the employer has met its burden, the *McDonnell Douglas* framework disappears and the only remaining issue is whether there is discrimination *vel non*, which requires the plaintiff to demonstrate by a preponderance of the evidence that the employer's stated reasons were a pretext for discrimination. *Id.* at 285 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000)).

It is undisputed that the first and second elements are met because Carr is a female and she consistently received satisfactory performance evaluations from her employer. However, Carr nevertheless fails to demonstrate a prima facie case as explained below.

As to the third element (adverse employment action), Carr contends that the following five actions taken against her constitute adverse employment actions:

(1) her transfer from TRU to patrol and her replacement by Corporal Carlton Jones in TRU;

(2) the suspension of her police powers and her placement in a non-supervisory position;

(3) the requirement that she undergo a psychiatric evaluation;

(4) the requirement that she obtain firearm recertification; and

(5) her transfer from TRU to the ASU.

The factual record before the Court demonstrates that Plaintiff was never actually transferred back to patrol work and that she was never replaced by Corporal Carlton Jones because Carr never went back on patrol (rather, she was suspended and placed back in TRU one day after her suspension hearing) and Jones could not have replaced Carr as both of them worked side-by-side for over a month until Jones requested a transfer out of TRU. Def.'s Ex. 1 Carr Dep. 80:10-22; Def.'s Ex. 2 Graves Aff. ¶ 57; Def.'s Ex. 2.9 at 1-2; Def.'s Ex. 7 High Dep. 17:7-13; Def.'s Ex. 11 Jones Dep. 14:19-22, 15:1 - 16:7.

Assuming that the suspension of Carr's police powers, the requirements that she undergo a psychiatric evaluation, obtain firearm recertification, and her transfer from the TRU to the ASU were adverse employment actions, Carr's prima facie case still fails because she has failed to demonstrate that the fourth element has been satisfied, namely that a similarly situated employee outside her class has received more favorable treatment.

Carr compares herself to two fellow employees, Carlton Jones and Lacey Tyler, neither of whom is similarly situated.  First, Carlton Jones was transferred into TRU because of his involvement with a highly publicized shooting while Carr was transferred into TRU because of the concerns she expressed about personal issues that she was working through. Def.'s Ex. 2 Graves Aff. ¶¶ 48-57; Def.'s Ex. 2.9 Transfer Roster at 1-2; Jones was not permitted to have contact with the public, while there was no such limitation on Carr.  Though Plaintiff spills much ink about the fact that Jones was permitted to transfer out of TRU when he requested, the record is devoid of any evidence that Carr sought to transfer or that such a request was ever denied.  Second, as to Lacey Tyler, Tyler was never even transferred to the TRU, much less transferred to the TRU to replace Carr, because the factual record demonstrates that Tyler was actually transferred to District V, Clinton station.  Def.'s Ex. 2 Graves Aff. ¶¶ 48, 58-59; Def.'s Ex. 2.9 Transfer Roster at 1-2.

Even if the Court were to find that Carr has stated a prima facie case of gender discrimination, summary judgment in Defendant's favor is still appropriate because Carr has failed to demonstrate that Defendant's legitimate, nondiscriminatory reason for taking each of the actions in question are pretextual.

First, even though Carr herself was never actually transferred back to patrol, the Department had a legitimate nondiscriminatory reason in ordering *all* able-bodied police officers (and, at the

7

time, Carr was considered an able-bodied officer fit for full-duty patrol status) back on patrol status in response to increasing crime rates. Def.'s Ex. 6 Hylton Dep. 20:19 - 21:22; Def.'s Ex. 7 High Dep. 14: 1-14, 15:12-16. There were many other officers who were transferred, including transferred to patrol, during this time. Def.'s Ex. 2.9 Transfer Roster at 1-2. Moreover, the Department sought to limit negative publicity and its liability by transferring Carlton Jones, who had been involved in a highly-publicized shooting, from active full-duty patrol status into the TRU in which he would not have any contact with the public. Def.'s Ex. 2 Graves Aff. ¶ 50; Def.'s Ex. 5 Hylton Aff. ¶¶ 62-69; Def.'s Ex. 7 High Dep. 17:7-13, 18:1-13. This is also consistent with internal Department policies in the Prince George's County Police General Orders Manual Vol. 1, Ch. 23 § 22, which provide that an officer is ordered to have no contact with the public during his duration in this status, which accompanies some sorts of investigations. Def.'s Ex. 2 Graves Aff. ¶ 52; Def.'s Ex. 2.10 at 1.

Second and third, the suspension of Carr's police powers and her order to undergo a psychiatric examination was predicated upon statements made by Carr to Sgt. Peel, including that "she would not put her self [sic] in the position (patrol officer) to get herself or others hurt due to her inability to focus on work." Pl.'s Ex. 9 Fitness for Duty Examination. These statements regarding Carr's concern about her own mental fitness and the impact that would have on her own and others' safety led to Peel to believe that Carr posed a threat to herself and to other employees. *Id.* Under internal Department policies, Peel had the discretion to find Carr's mental health concerns made it in the best interest of the officer, her colleagues, the Department, and the public to suspend her from full-duty patrol status as it would have presented an opportunity for Carr to harm herself, her fellow officers, or the public while suspending those exact police powers of Carr's

and ensconcing her in the TRU in which she could not exercise those powers prevented that harm from resulting. Def.'s Ex. 2 Graves Aff. ¶¶ 38-39; Def.'s Ex. 2.7 Vol. I Ch. 23 § 20 at 1-2 (authorizing the suspension of officers when they report serious debilitating psychological problems that renders them unfit *or* when it would be the best interest of the public, officer, or the Department to relieve that officer of duty).

The factual record before the Court demonstrates that Carr made these statements to Peel; Carr herself stated so in her deposition testimony, her written statement in the investigation, and her testimony at her suspension hearing; Carr stated that she was not "gonna go out there and get herself or get someone else killed as a result of her frame of mind" and that she "could not deal with being on the street [as] [she] was going to counseling and just being sick physically." Def.'s Ex. 1 Carr Dep. 63:4-22, 64:1-7; Def.'s Ex. 10 Peel Aff. ¶¶ 19-20; Def.'s Ex. 10.1 Carr Statement to Peel at 2, 10; Def.'s Ex. 10.2 Suspension Hr'g Tr. 2, 5-6. Though the MAB ultimately found Carr fit for full-duty status after its investigation, Carr's suspension was necessary until this determination was made by the MAB's member physicians, who were charged with assisting the Department with its fitness-for-duty determinations. Def.'s Ex. 2 Graves Aff. ¶¶ 34, 44; Def.'s Ex. 5 Hylton Aff. ¶¶ 58-59; Def.'s Ex. 5.6 MAB Determination at 15; Def.'s Ex. 9 Disque Aff. ¶ 16; Def.'s Ex. 9.1 Investigatory File at 2.

Fourth, the requirement that Carr obtain firearm recertification was due to the fact that her night-fire scores had lapsed (she had not qualified in 2006 for the 2005 calendar year) and this was a standard qualification and requirement for officers in the Department according to internal policies. Def.'s Ex. 9 Disque Aff. ¶¶ 17-19; Def.'s Ex. 13 Fox Aff. ¶¶ 7-19; Def.'s Ex. 13.1 Firearms Scores at 1-5. Though Carr relies upon her conclusory allegations in her deposition that

she was fully qualified for both day- and night-fire in 2005, Carr has failed to present any factual support for this contention. Rather, a review of the firearms scores in the record reveals that Carr did not complete the night-fire course during 2006. Def.'s Ex. 13.1 Firearms Scores at 1-5.

Fifth, there was no difference in salary or benefits from TRU to ASU; Carr received the same rank, pay, salary, duties, and benefits as she previously had in the TRU without the need for Carr to perform shift work, which Carr had demonstrated a preference for avoiding due to her childcare needs. Def.'s Ex. 1 Carr Dep. 36:20 - 37:15, 38:8-19, 65:12 - 66:2,110:21-22; Def.'s Ex. 2.11 Prince George's County Code § 16-121; Def.'s Ex. 5 Hylton Aff. ¶¶ 29-31; Def.'s Ex. 19.3; Def.'s Ex. 2 Graves Aff. ¶¶ 60-62. Carr's typical hours in the ASU begin between 8:00 a.m. through 9:00 a.m. in the morning and end at approximately 4:00 p.m. in the evening, which accommodated her childcare arrangements. Def.'s Ex. 1 38:11-17. Carr herself conceded that the ASU was not considered a demotion in any way from the TRU and that she received the same pay and benefits. Def.'s Ex. 1 Carr Dep. 39:18 - 40:5. This position does not involve shift work, which provides a higher rate of pay known as "shift differential" to the officer, nor does it permit the officer to work overtime. Def.'s Ex. 1 34:6-19; 38:11-17.

It is undisputed that under internal Department policies, Carr's assignment to the TRU was discretionary, that it was intended to be temporary to permit her to take care of her personal issues (including her child care) that were presenting difficulties in her personal life, and that the Department could reassign her depending upon its needs. Def.'s Ex. 2 Graves Aff. ¶ 62; Def.'s Ex. 6 Hylton Dep. 21:1-22; Def.'s Ex. 7 High Dep. 11:20 -12:9, 14:1-14; Def.'s Ex. 9 Disque Aff. ¶ 15; Def.'s Ex. 9.1 Investigatory File Cox Statement at 41-42 and Davis Statement at 45, Def.'s Ex. 20 Peel Dep. 15:14-20.

That the Department found it necessary to readjust its staffing in its various divisions to best serve the interests of the Department as a whole is contemplated not only by its own internal policies but also by Fourth Circuit case law. Def.'s Ex. 2 Graves Aff. ¶ 62; *see also Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 377 (4th Cir. 1995) (holding that Title VII "is not a vehicle for substituting the judgment of a court for that of the employer."). Specifically, light-duty assignments, which is what Carr was assigned to in the TRU, are limited in duration to 180 days initially pending a finding of necessity from an independent medical examination that must be conducted prior to the 120th day and thereafter every 30 days. Def.'s Ex. 2 Graves Aff. ¶ 33; Def.'s Ex. 2.6 at 3. This decision is reviewed by the Medical Advisory Board, and employees may remain on light-duty assignments until they are returned to full-duty status by their physician *or* ordered back to full-duty status by the Chief of Police depending on the needs of the Department. Def.'s Ex. 2 Graves Aff. ¶¶ 36-37; Def.'s Ex. 2.6 at 3. Moreover, Lt. White was the decisionmaker regarding Carr's transfer from the TRU to the ASU in September 2007 and there is no evidence in the record that White based the transfer decision on an impermissible consideration such as gender. Def.'s Ex. 6 Hylton Dep. 75:13 - 77:17.

Because "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment

action," Plaintiff has not met her burden under the *McDonnell Douglas* framework[2]. *Williams*, 871 F.2d at 456. Accordingly, the Court finds that judgment as a matter of law in favor of Defendant is appropriate on this ground.

### 3.   Retaliation

In addition to prohibiting discriminatory practices, Title VII prohibits retaliation against an employee who has engaged in activity protected by Title VII, such as filing a complaint of discrimination. To establish a prima facie case of retaliation, Carr must establish that (1) she engaged in protected activity, (2) her employer took an adverse action against her, (3) and a causal

---

[2] It is unclear whether Carr is advancing a hostile work environment claim under Title VII. Her EEOC Charge and Complaint do not assert such a claim. Even if the Court were to construe Carr's allegations in her motions as advancing a hostile work environment claim as it relates to the purportedly humiliating and offensive conduct by her colleagues after learning of her sexual assault, Carr has failed to demonstrate a prima facie case. To establish a prima facie case, Carr must demonstrate that (1) she was subject to unwelcome conduct (2) which was based on sex (3) and that it was sufficiently pervasive or severe to alter her conditions of employment and (4) some basis exists for imputing liability to the employer. *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000).

Any such claim by Carr fails for the lack of factual support in the record. There is no evidence in the record to support the necessary finding that Carr's workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [Carr's] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993). "The standard for proving an abusive working environment is intended to be a very high one." *Id.*. Carr has not met that high standard here: she cites no conduct that could be characterized as sexually offensive nor are there any facts that support an inference that she was treated differently because of her gender. Rather, Carr's belief that some of her colleagues knew about her sexual assault does not rise to the level of a hostile work environment. *See, e.g. Dwyer v. Smith*, 867 F.2d 184, 187-88 (4th Cir. 1989). The Fourth Circuit has consistently held that a plaintiff's "bare assertions" alone in the absence of factual support in the record do not suffice to establish a hostile work environment claim. *Mann v. First Union Nat'l Bank*, No. 05-1449, 2006 WL 1676397, at *5 (4th Cir. June 3, 2006).

relationship existed between her protected activity and the employer's adverse action. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). If the employer can then proffer a nonretaliatory reason for its action, Carr must then show that the employer's proffered reason is pretextual. *Id.* That the Court has rejected Carr's discrimination claim does not affect her ability to establish a retaliation claim, provided that she reasonably believed that she was the subject of prohibited discrimination. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 357 n.1 (4th Cir. 1985) ("An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination."), *overruled in part on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 238 n.2 (1989).

It is undisputed that Carr's filing of her discrimination complaint constitutes protected activity. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (holding that prior EEO complaint constitutes protected activity); *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 551 (4th Cir. 1999) (holding that participation in any manner in a Title VII investigation, proceeding, or hearing is protected activity). Carr alleges that her other instance of protected activity is her February 9, 2006 letter to Percy Alston complaining about her proposed transfer and being replaced by a male that she copied to her fellow Corporal, Donald Bell. Def.'s Ex. 3.2; Def.'s Ex. 18.2.

Even assuming that Carr has demonstrated protected activity, she has failed to satisfy the other elements of her prima facie case. Specifically, the lack of causation in this instance proves fatal to Carr's claim.

First, with regard to Carr's letter to Alston, the facts in the record before the Court demonstrate that Hylton, High, Graves, and Peel – the relevant decisionmakers who were alleged to have taken the alleged adverse employment actions against Carr – were not aware of the fact that

Carr had sent this letter to Alston. Her friend and fellow Corporal, Donald Bell, who is alleged to have been copied on the letter, did not recall seeing it or taking any action as a result of it, and was not a decisionmaker in any event. Def.'s Ex. 3 Bell Aff. ¶¶ 27-34; Def.'s Ex. 4 Bell Dep. 19:9-22, 21:3-13. Hylton and High testified that they never saw the letter to Alston and Graves never received any internal charge or letter asserting any discrimination claims. Def.'s Ex. 2 Graves Aff. ¶¶ 15, 19-20; Def.'s Ex. 5 Hylton Aff. ¶¶ 9-13; Def.'s Ex. 7 High Dep. 27:13-22, 29:8-10; 34:6-10. Knowledge by the decisionmaker of the plaintiff's protected activity is "absolutely necessary" to establish causation in a retaliation case. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

Moreover, there is no factual support in the record for any proposal to transfer Carr from TRU to the CID/Sexual Assault Unit. Def.'s Ex. 2 Graves Aff. ¶¶ 24-25; Def.'s Ex. 2.4 Carr Personnel File. To the contrary, the record demonstrates that Waddy never offered Carr a position at the CID, but instead made a general comment in Carr's presence that Waddy wished to take everyone with her to the CID. Def.'s EX. 8 Waddy Aff. ¶¶ 6-8. Carr herself concedes that she was never formally offered a position or transfer to CID other than Waddy's comment. Def.'s Ex. 1 Carr Dep. 48:12-22, 49:1-3.

Second, with regard to Carr's formal Charge of Discrimination with the EEOC, of which the Intake Form was filed on May 31, 2006, and the Charge itself was filed on June 1, 2006, Carr also cannot demonstrate the requisite knowledge on the part of her decisionmakers because four out of the five alleged employment actions occurred *prior to* her filing of her intake form and formal charge with the EEOC. Carr also conceded that she never filed an internal charge of discrimination with the Department. Def.'s Ex. 1 Carr Dep. 56:1-13, 58:17-22, 98:1-6; Def's Ex. 12 Pl.'s Ans. to

Interrog. # 5.  Significantly, because the EEOC sent the Charge of Discrimination[3] to the wrong person (Donald Bridgeman instead of Graves), the official Charge of Discrimination from the EEOC was not received nor could it be located anywhere in the files.  Pl.'s Ex. 9 EEOC Determination.  Though the evidence in the record demonstrates that Kathy Gwynn-Jones, SPHR, contacted the Prince George's County Government Office of Law to request its assistance regarding Carr's EEOC Charge of Discrimination on December 5, 2006, *see* Pl.'s Ex. 8, there are no facts in the record that impute the knowledge of Gwynn-Jones to any of the relevant decisionmakers who are alleged to have taken the allegedly adverse employment actions against her.  *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that plaintiff's failure to demonstrate that officials were aware of his contact with the EEO counselor or his filing of administrative complaint at the time the alleged retaliation occurred was fatal to a finding of a prima facie case).

There is no evidence that Lt. White, who was responsible for ordering Carr's transfer from the TRU to the ASU was even aware of her protected activity or that the decision was made for any reason other than to accommodate the Department's staffing needs and to comply with the Department's internal policies.  The time lag between Carr's protected activity of filing her EEOC charge and her transfer to the ASU was fifteen months, which clearly exceeds the outer limits that have been upheld as sustaining an inference of causation.  *Compare Williams v. Cerberonics, Inc.*,

---

[3] Plaintiff makes much ado about the fact that the fact that the EEOC found that there was reasonable cause to believe that the Department had violated Title VII by engaging in gender discrimination.  However, a full reading of the EEOC determination reveals that that the EEOC issued that finding on the ground that the Department had not responded to the Commission's requests for a response to the charge of discrimination, which had been mailed to the incorrect person (Donald Bridgeman instead of Graves) and that the failure to respond supported an inference "that examination of [the Department's] evidence would not refute [Carr's] allegations."  Pl.'s Ex. 9 EEOC Determination.  This determination was predicated *solely* upon Carr's allegations.

871 F.2d 452, 457 (4th Cir. 1989) (holding three-month nexus sufficient to establish causal connection) *with Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (citing with approval *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month nexus was too weak to justify inference of causation)).

Carr presents no facts that tend to show the actions taken against her were due to her gender rather than Defendant's beliefs that (1) it was accommodating her stated preference for non-patrol work that would permit her to work through her personal issues and child care; (2) Carr posed a self-admitted risk to herself, her colleagues, and the public if placed on patrol because of those issues; (3) Carr needed to undergo a psychiatric exam to determine if that finding could be sustained; (4) Carr needed to requalify with her weapon as did all other officers; and (5) once she was found fit-for-duty, the Department was in need of all able-bodied officers to combat rising crime rates. The factual record before the Court demonstrates that each alleged adverse employment action was based entirely on Carr's representations regarding her mental state, Department policies regarding the procedure regarding those claims, and the staffing and certification needs of the Department. No reference was made to her prior EEO activity whatsoever. Accordingly, Carr has thus failed to show that her prior EEO activity and the actions taken were causally connected, and thus has not made out a prima facie case of retaliation.

Even assuming *arguendo* that the Court were to find that Carr has made out a prima facie case of retaliation, for the reasons discussed in greater detail above in the discrimination section, Defendant has articulated legitimate, nondiscriminatory reasons for the actions taken with respect to Carr and she has failed to demonstrate that they are pretextual. Even if the Department was incorrect in its belief that Carr was unfit for duty, Carr has not demonstrated that this was not an

honestly-held belief; to the contrary, the record is replete with facts that demonstrate that the belief was honestly held and investigated.  Carr is similarly unable to demonstrate that she was qualified with her weapon and that the Department was not in need of her services as an able-bodied and cleared for full-duty patrol status officer.  Accordingly, the Court finds that Carr's prima facie case of retaliation fails as a matter of law and that, in any event, Carr has failed to demonstrate that Defendant's legitimate, nonretaliatory reasons are pretextual.

### CONCLUSION

For the foregoing reasons, the Court will, by separate order, grant Defendant's motion for summary judgment.


Date: August 14, 2009                                        /s/
                                                                Roger W. Titus
                                                                United States District Judge